# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

TODD MICHAEL REARDON and
JOHN ROBERT REARDON,

                    Plaintiffs,                    Case No. 18-CV-1722-JPS

v.

MATTHEW SCHOSSOW, KRISTIN L.                       **ORDER**
SUDINSKI-TORYFTER, CITY OF
MEQUON, and JOHN AND JANE
DOES,

                    Defendants.

---

This case arises from a police department's attempt to thwart underaged drinking in Mequon. On October 30, 2018, Todd Michael Reardon and his son, John Robert Reardon (collectively "Plaintiffs"), filed a complaint alleging that the Mequon City Police ("MCP") violated their constitutional rights when MCP conducted an unlawful search of their home. (Docket #1). On October 31, 2015, MCP responded to an anonymous tip about underaged drinking. They went to Plaintiffs' home, searched the curtilage, and obtained a search warrant based, in large part, on open bottles of alcohol that were seen during the curtilage search. When MCP finally executed the warrant, there was hardly a bacchanalian hotbed of criminal activity. The fruits of their labor resulted in a social host violation to the younger Reardon, which was ultimately dropped, and three underaged drinking citations to his guests. Plaintiffs filed this civil action in federal court, alleging an unconstitutional search of the curtilage of the home, an unconstitutional search of the home based on an invalid warrant,

supervisory liability for failing to intervene in the constitutional violations, and an unconstitutional policy directed at quelling underaged drinking. The parties filed competing motions for summary judgment, which are now fully briefed. (Docket #16, #24). For the reasons explained below, the Plaintiffs' motion will be granted in part, and the Defendants' motion will be granted in part.

## 1.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides that the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). A fact is "material" if it "might affect the outcome of the suit" under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The court construes all facts and reasonable inferences in the light most favorable to the nonmovant. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016). The court must not weigh the evidence presented or determine credibility of witnesses; the Seventh Circuit instructs that "we leave those tasks to factfinders." *Berry v. Chi. Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010). The party opposing summary judgment "need not match the movant witness for witness, nor persuade the court that her case is convincing, she need only come forward with appropriate evidence demonstrating that there is a pending dispute of material fact." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 921 (7th Cir. 1994).

## 2.     RELEVANT FACTS

In 2015, the City of Mequon had an anonymous, now-defunct tip hotline called "TIP411." The hotline received false tips as well as true tips. The parties dispute whether this hotline was part of a larger campaign to prohibit underaged drinking.

On October 31, 2015, at approximately 10:19 p.m., Mequon police received an anonymous message through the "Tip411" app, which alleged that teenagers were drinking alcohol at Plaintiffs' residence. Specifically, the message read, "Many students at my school were bragging about how they planned to go to J.R.'s house on halloween [sic] night to drink and smoke. I am nervous that someone is going to drink and drive (because most homestead kids do it and don't worry about the consequences.)."

On the basis of this tip, at approximately 10:30 p.m., Mequon police dispatched squad cars to Plaintiffs' residence, whereupon they observed four cars in the driveway and one car parked in the street. Officer Kristin Sudinski-Toryfter ("Toryfter"), the primary responding officer, knocked on the door and rang the doorbell, but nobody answered. She attempted to call John and Todd Reardon on their cell phones, but neither responded. She also called the suspected driver of one of the parked cars, but again, nobody answered.

The lights inside the residence were turned on, allowing officers to see inside relatively well. Above the front door of the home, an expansive, half-moon window looked onto an upstairs landing, where the officers observed several young people scattering, crawling up the stairs, and peeking out at them. The officers also heard people talking, and various doors and windows inside the house closing. Everyone appeared to be a minor, and there did not seem to be any adults present.

While some of the officers, including Toryfter, were at the front door, two other officers, including Officer Matthew Schossow, ("Schossow"), the acting shift supervisor, went around the side of the house to the backyard as part of an effort to secure the perimeter. The officers were concerned that people might attempt to flee out the back door. The house is large and sits on an amply sized lot with a considerable set-back from the street. There are no gates surrounding the home. There are, however, bushes, shrubs, and trees landscaping the plot of land. In the backyard, which is hidden from public view and accessible only from the end of the driveway and the home itself, a brick pathway passes by a window near the rear patio door. The brick pathway leads from the top of the driveway around to the back of the home. The parties dispute whether the blinds to this window were partially or fully drawn, whether Schossow stepped off the walkway and peeked into the home through a crack in the blinds, and which window he looked into, but these disputes are immaterial. While Schossow was inspecting the back of the home, he saw, through a gap in the blinds, a can of Pabst Blue Ribbon on the end-table, and an open bottle of vodka on the floor, along with other non-alcoholic beverages. Toryfter followed him to the backyard and stepped closer to the window, confirming the contraband. Neither officer actually saw any of the young people drinking alcohol.

After seeing the alcohol containers, and in light of the fact that the young people refused to answer the door, Toryfter called the city's district attorney, Adam Gerol, who told Toryfter to apply for a search warrant. Toryfter filled out the search warrant application and completed the corresponding affidavit in support thereof using a pair of templates designed to expedite the process during an investigation. Schossow did not review the warrant or the paperwork. Toryfter attested that there were

items to be searched in the house that included alcoholic beverages and persons under the age of 21, both of which were potentially evidence of a violation of Wis. Stat. § 125 *et seq.*, which prohibits furnishing alcohol to underaged persons. She also stated that there was a party at the house "which possibly included guests under the age of 21 consuming intoxicants or illegal drugs," that there were "numerous vehicles" outside the home, that she had "observed intoxicants within the premises, having seen them. . .through the window. . .of the residence," and that "young people scatter[ed] or hid[] when it appeared that the officers had been noticed or recognized." (Docket #27-2 at 2). At no point did Toryfter represent that she saw the young people consuming intoxicants inside the premise. After she filled out the paperwork, she drove to Ozaukee County Circuit Court Judge Sandy Williams's home, where Judge Williams reviewed the affidavit and they discussed the warrant together.

At approximately 1:00 a.m. on November 1, 2015, Judge Williams issued a search warrant for the house. Toryfter relayed this to the officers by radio as she drove back to Plaintiffs' residence. Schossow participated in the warrant's execution by knocking on the front door, announcing his presence, and proceeding to find entry into the home. In the nearly three hours between when the officers first arrived at the home and when they executed the search warrant, they did not see anyone entering or exiting the property. They also did not interact with any of the teenagers, or see anyone fighting, vomiting, stumbling, or otherwise acting inebriated.

The officers executed the warrant at approximately 1:15 a.m. Pursuant to the warrant, they detained, searched, and cited the younger Reardon for a social host infraction, in violation of the City of Mequon's "social host" ordinance, which prohibits people from hosting gatherings

where underaged drinking will occur. *See* Mequon City Ord. Ch. 46, art. VI, § 157(c). The charge was ultimately dropped. The officers issued citations to three other minors for underaged drinking.

Schossow and Toryfter each have experience working in the field, and have been properly trained in search and seizure law and procedures. They receive updates to their training on an annual basis, and have resources at their disposal regarding how to properly effect searches.

### 3. ANALYSIS

Plaintiffs and Defendants each move for summary judgment. There are two purportedly unconstitutional searches here: first, the warrantless search of the curtilage; and second, the search of the home based on an invalid warrant. Plaintiffs bring a claim against both Schossow and Toryfter for the warrantless search of the curtilage, but only bring a claim against Toryfter for the invalid warrant. The Court notes that obtaining an invalid warrant does not intrinsically give rise to a constitutional violation; it is in the execution of the invalid warrant that the Plaintiffs' rights are implicated. For the reasons explained below, summary judgment will be decided in favor of Plaintiffs on both Fourth Amendment violations—the curtilage claim against Toryfter and Schossow, and the invalid warrant claim against Toryfter. Plaintiffs bring a claim against Schossow for supervisor liability, claiming that he failed to stop the obtention and execution of the invalid warrant. This claim is improperly pled and will be dismissed. Assuming that Schossow was personally involved in obtaining and executing the warrant, he likely would have been directly liable for the Fourth Amendment invalid warrant claim discussed in Section 3.2, *infra*, had it been brought against him. He was not, however, liable in a supervisory capacity for failing to intervene in his own conduct—that is not logical.

Additionally, there is no evidence of municipal liability; that claim will be dismissed for the reasons explained below. Finally, in light of Plaintiffs' failure to oppose the issue, the Doe defendants will be dismissed, as will the Plaintiffs' undeveloped Fifth and Fourteenth Amendment Claims.

### 3.1 Fourth Amendment Warrantless Search of Curtilage Claim Against Schossow and Toryfter

Plaintiffs submit that there is enough undisputed evidence in the record to establish that their Fourth Amendment rights were violated when MCP breached the curtilage of their home. Defendants, by contrast, submit that they are entitled to a judgment based on qualified immunity on the threshold question of whether there is a constitutional rights violation— they contend that there clearly is not. Plaintiffs' motion will be granted for the reasons explained below.

The area "immediately surrounding and associated with the home," also known as the "curtilage" of the home, is constitutionally protected against unreasonable searches and seizures. U.S. Const. art. IV; *Florida v. Jardines*, 569 U.S. 1, 6–7 (2013) (citations and quotations omitted). "At common law, the curtilage is the area to which extends the intimate activity associated with the sanctity of a man's home and the privacies of life." *Oliver v. United States*, 466 U.S. 170, 180 (1984) (citations and quotations omitted). The Supreme Court offers four factors to evaluate for whether an area falls within the curtilage of the home: "the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by." *United States v. Dunn*, 480 U.S. 294, 301 (1987). These factors should not be mechanistically applied; rather, they are "useful

analytical tools" to assess whether an area is "so intimately tied to the home itself that it should be placed under the home's umbrella of Fourth Amendment protection." *Id.* Against this legal backdrop, the Seventh Circuit has established that officers approaching a home, and necessarily encountering some degree of curtilage, "may use the route which any visitor to a residence would use. . .for the purpose of making a general inquiry or for some other legitimate reason." *United States v. French*, 291 F.3d 945, 954 (7th Cir. 2002) (citations and quotations omitted); *United States. v. LePage*, 477 F.3d 485, 488 (7th Cir. 2007) ("[O]fficers may walk up to that part of private property that is open to visitors or delivery people.").

The walkway from which Defendants claim they saw the contraband was approximately ten feet from the home, putting it well within an area where "privacy expectations are most heightened." *French*, 291 F.3d at 951 (noting that areas within twenty feet of the home generally have higher expectations of privacy). The walkway itself was not enclosed, but it was secluded, flanked by shrubs and trees, and not visible from the street or even the front of the house. Rather, it snaked closely around the back of the house, linking the very end of a lengthy driveway to the patio, which was located on the other side of the yard, and which could not be seen from the start of the walkway. *See* (Docket #28-1 at 1). This was not an open-to-the-public walkway that lead to structures in plain view of the driveway. *See French*, 291 F.3d at 953. Nor was any of the activity occurring "in plain view of the public way." *United States v. Contreras*, 820 F.3d 255, 262 (7th Cir. 2016). Nor did this walkway clearly lead to a door that would be open to visitors or delivery people. *See LePage*, 477 F.3d at 488 (upholding a *Terry* stop where officers walked from sidewalk onto front porch to investigate contents of a duffel bag). Rather, the pathway at issue here was an

inconspicuous path that hugged the rear perimeter of the home and led to a secluded sitting area in the backyard. On balance, this pathway was part of the curtilage, and Plaintiffs had a reasonable expectation of privacy in it.

Schossow attempted to secure the perimeter by following the pathway around the home to the backyard; in doing so, he looked through gaps in the blinds and noticed the presence of alcohol. Shortly thereafter, Toryfter also followed the pathway around the home to confirm the sight of the alcohol containers. Because the walkway is part of the curtilage and is not clearly accessible to the public, when Schossow and Toryfter used it to enter the backyard, they violated the Fourth Amendment. Defendants submit that there is no constitutional violation because they were in the process of securing the perimeter, which is a legitimate law enforcement objective. Defendants do not, however, cite any cases in support of their broad contention that legitimate law enforcement objectives are an exception to the curtilage rule. (Docket #33 at 7–8). In *United States v. Butler*, this Court noted that officers may have had a "legitimate reason" to enter the common area backyard of a duplex—where the defendant did not have a reasonable expectation of privacy—in order to conduct a "knock and talk" procedure as part of a criminal investigation. 2007 WL 2220260, at *8 (E.D. Wis. Aug. 1, 2007). That case did not, as Defendants suggest, stand for the proposition that law enforcement officers may intrude upon a home or curtilage anytime they have a "legitimate law enforcement objective." Similarly, in *United States v. Davis*, which is the magistrate's report and recommendation that this Court adopted in *Butler*, the magistrate determined there was no Fourth Amendment violation because there was no evidence that the backyard was not open to visitors or delivery people. 2007 WL 2220261, at *8 (E.D. Wis. April 16, 2007). After drawing this

conclusion, the *Davis* court then speculated that the police's presence in the backyard was appropriate because it was related to protecting officers conducting the "knock and talk" occurring around front. Like this Court's order in *Butler*, the *Davis* report and recommendation did not cite any precedential caselaw in support of the contention that law enforcement officers may intrude upon a home anytime they have a "legitimate law enforcement objective." Nor could it: such a holding would gut the Fourth Amendment of its protections, and result in routine circumvention of the warrant process.

### 3.1.1   Qualified Immunity

Qualified immunity shields officials from the civil consequences of their constitutional violations when the law did not put the officials on clear notice that their conduct would be unlawful. *Saucier v. Katz*, 533 U.S. 194, 202 (2001). The test for qualified immunity is (1) whether the defendants' alleged actions violated the plaintiff's constitutional rights; and (2) "whether the implicated right was clearly established at the time." *Jones v. Wilhelm*, 425 F.3d 455, 461 (7th Cir. 2005). Once the defense is raised, the plaintiff bears the burden to defeat it. *Weinmann v. McClone*, 787 F.3d 444, 450 (7th Cir. 2015). To overcome an assertion of qualified immunity, Plaintiffs must first proffer facts which, if believed, amount to a violation of their constitutional rights. *Katz*, 533 U.S. at 201. As the discussion above shows, Plaintiffs have done this. Next, the Court must evaluate whether the right was "clearly established under applicable law at the time and under the circumstances that the defendant official acted." *Easterling v. Pollard*, 528 Fed. App'x 653, 656 (7th Cir. 2013).

A right is clearly established if it would be obvious to a reasonable state actor that "what they are doing violates the Constitution, or if a closely

analogous case establishes that the conduct is unconstitutional." *Siebert v. Severino*, 256 F.3d 648, 654–55 (7th Cir. 2001). Factually identical precedent is not necessary; the guiding question is whether the official would have had "fair warning" that the conduct was unconstitutional. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). "In determining whether a defendant's alleged actions violated a clearly established right, courts may properly take into account any information the defendant ought reasonably to have obtained." *Jones*, 425 F.3d at 461.

Defendants argue that *Butler* and *Davis*, an order and magistrate recommendation from 2007, demonstrate that the law was not clearly established as to whether a "legitimate law enforcement objective" was an exception to the curtilage rule. However, as discussed above, neither of these cases stand for this proposition, nor could they—if "legitimate law enforcement objective" was an exception in every curtilage case, then the protections of the Fourth Amendment from government intrusion would be flimsy, and the warrant requirement basically null. The Fourth Amendment has well-delineated exceptions to the warrant requirement, all of which require exigent circumstances. These exceptions include "hot pursuit" of an escaping suspect, when emergency aid is needed, and when necessary to prevent the destruction of evidence. *United States v. Santana*, 427 U.S. 38, 42–43 (1976) (exception to warrant requirement when police are in hot pursuit of a fleeing felon who escapes to a private home); *Schmerber v. California*, 384 U.S. 757, 770–71 (1966) (exception to warrant requirement where officer reasonably believes that destruction of evidence is imminent and unavoidable); *Michigan v. Fisher*, 558 U.S. 45, 48 (2009) (exception to warrant requirement where officer reasonably believes that an emergency resulting in serious injury is occurring). Courts "look[] to the nature of the

underlying offense as an important factor to be considered in the exigent-circumstances calculus." *Welsh v. Wisconsin*, 466 U.S. 740, 750–51 (1984) (discussing why "a finding of exigent circumstances to justify a warrantless home entry should be severely restricted when only a minor offense has been committed"). Furthermore, in 2013, the Supreme Court made clear that officers conducting a "knock and talk" without a warrant were permitted to "approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." *Florida v. Jardines*, 569 U.S. at 8.

In light of these well-settled principles and the Supreme Court's instruction in *Jardines* on the boundaries of the "knock and talk" investigative tactic, a reasonable police officer in 2015 would know that the broad catch-call of "legitimate law enforcement objective" is not an exception to the Fourth Amendment's curtilage rule, particularly when the law enforcement objective is to catch drunk teenagers running home. Defendants have not argued that any other exception to the warrant requirement existed, nor do the facts suggest an exception. The fact that Defendants were able to cite an order and recommendation from 2007 that allowed police to go into the backyard of a duplex in support of a knock and talk does not mean that the law was unclear as to whether there was a "legitimate law enforcement objective" exception to the curtilage rule, particularly in light of subsequent Supreme Court caselaw. Accordingly, the Defendants' motion for qualified immunity must be denied.

### 3.2 Fourth Amendment Fraudulently Obtained Warrant Claim Against Toryfter

Plaintiffs submit that there is enough undisputed evidence in the record to establish that the warrant was invalid, and that Toryfter

fraudulently obtained it. Defendants, by contrast, contend that they are entitled to a judgment based on qualified immunity because there is no constitutional violation or, in the alternative, because the affidavit contained sufficient independent probable cause. For the reasons explained below, the Court finds that Toryfter's affidavit lacked probable cause and the warrant—and subsequent search of Plaintiffs' home—was invalid and unconstitutional.

"[A] warrant request violates the Fourth Amendment if the requesting officer knowingly, intentionally, or with reckless disregard for the truth, makes false statements in requesting the warrant and the false statements were necessary to the determination that a warrant should issue." *Knox v. Smith*, 342 F.3d 651, 658 (7th Cir. 2003) (citing *Beauchamp v. City of Noblesville, Ind.*, 320 F.3d 733, 742–43 (7th Cir. 2003); *Olson v. Tyler*, 771 F.3d 277, 281 (7th Cir. 1985)). "When an affidavit is the only evidence presented to a judge in support of a search warrant, the validity of the warrant rests solely on the strength of the affidavit." *United States v. Peck*, 317 F.3d 754, 755 (7th Cir. 2003). "[S[]uppression of evidence seized pursuant to a search warrant that is later declared invalid is inappropriate if the officers who executed the warrant relied in good faith on the issuing judge's finding of probable cause." *United States v. Adams*, 2019 WL 3927514, at *4 (7th Cir. Aug. 20, 2019) (quoting *United States v.* Watts, 535 F.3d 650, 656–57 (7th Cir. 2008)). Often, "[a]n officer's decision to obtain a warrant is prima facie evidence that the officer was acting in good faith." *Id.* However, "[a] defendant can rebut this presumption in several ways, including by showing that 'the affidavit submitted in support of the warrant was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable."'" *Id.* (citing *Olson,* 408 F.3d at 372) (internally

quoting *United States v. Leon*, 468 U.S. 897, 924 (1984)). "Overcoming the presumption of good faith is no small feat, as an officer cannot ordinarily be expected to question a judge's probable cause determination." *Id.* (quoting *United States v. Lickers*, 928 F.3d 609, 619 (7th Cir. 2019)). When a search is made "pursuant to a facially valid warrant issued by a judicial officer," the police violate Plaintiffs' rights "only if reasonably well-trained officers in their positions should have known that the testimony or affidavits they provided in support of the warrants would have failed to establish probable cause, so that they should not have applied for the warrants in the first place." *Beauchamp v. City of Noblesville, Ind.*, 320 F.3d 733, 743 (7th Cir. 2003) (citing *Malley v. Briggs*, 475 U.S. 335, 345 (1986)). "In reviewing the validity of a search warrant supported by an affidavit containing information that is in part unlawfully obtained. . .we must consider whether the untainted information, considered by itself, establishes probable cause for the warrant to issue." *United States v. Johnson*, 876 F.2d 589, 592 (7th Cir. 1989) (citations and quotations omitted).[1]

---

[1]Plaintiffs' contention that Toryfter lied about investigating a crime is without merit. Wis. Stat. § 125.07(a)(1) prohibits any person from procuring, selling, dispensing or giving "any alcohol beverages to any underage person not accompanied by his or her parent, guardian or spouse who has attained the legal drinking age." This subsection applies equally to minors who furnish alcohol to their minor friends as it does to adults who furnish alcohol to minors. *Smith v. Kappell*, 433 N.W.2d 588, 590–91 (Wis. Ct. App. 1988). The penalties for a violation of Wis. Stat. § 125.07(a) range from forfeiture of money to imprisonment, depending on whether a violation had previously occurred within thirty months. Wis. Stat. § 125.07(b). Wis. Stat. § 939.12 defines a crime as "conduct which is prohibited by state law and punishable by fine or imprisonment or both. Conduct punishable only by a forfeiture is not a crime." Furnishing alcohol to minors is punishable not only by forfeiture, but also by imprisonment. Wis. Stat. § 125.07(b). Therefore, furnishing alcohol to minors is a crime under Wisconsin law.

Defendants became aware that there were open bottles of alcohol in the Plaintiffs' home during the unlawful search of the curtilage. Defendants do not argue that they would have independently discovered the alcohol by some other constitutional source. Accordingly, the Court must evaluate whether the remaining facts in the affidavit—the anonymous tip, the presence of young people, and the unwillingness to open the door—gave rise to probable cause that someone had furnished alcohol to minors. *Id.* A tip from an anonymous informant rarely establishes probable cause for a search warrant; there must be additional indicia of reliability to support probable cause. *Illinois v. Gates*, 462 U.S. 213, 227 (1983); *Alabama v. White*, 496 U.S. 325, 329 (1990) (noting that "an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity"); *United States v. Johnson*, 289 F.3d 1034, 1038 (7th Cir. 2002) (noting that probable cause determinations based on a tip turn on the informant's "reliability, veracity, and basis of knowledge") (abrogated on other grounds). Such indicia of reliability can be deduced from the totality of the circumstances, and may include whether the tip contains detailed information, whether the informant is reliable, whether the tip is predictive, and whether it can be corroborated by subsequent investigation. *Alabama*, 496 U.S. at 331–332; *Navarette v. California*, 572 U.S. 393, 398 (2014) (evaluating an anonymous tip for reasonable suspicion).

Toryfter completed her affidavit on the basis of the following set of facts: an anonymous tip indicated that there would be underaged drinking and driving at a particular residence on a particular night. Toryfter did not know who the anonymous tipster was, whether he was reliable, or how he had a basis for this knowledge. The affidavit does not explicitly discuss the anonymous tip, but it refers to the fact that officers were alerted to the

possibility of underaged drinking, presumably by a "citizen witness." Aside from that, there is no information regarding the informant's identity, the source of his information, or the reliability of his information. When MCP went to the home to investigate the tip, they found five cars parked outside—four in the driveway, and one in the street. This suggested that there may have been visitors to the home, but is not conclusive evidence of a party. When the police rang the doorbell, nobody answered, but they saw several young people scattering inside.

This offered slightly stronger evidence that something was afoot—and it confirmed the tip's detail that a gathering of young people occurred at the house—but hosting a gathering and declining to answer the door on Halloween are innocent details which, even taken together, do not suggest criminal activity. *Draine v. Bauman*, 708 F. Supp. 2d 693, 702 (N.D. Ill. 2010) (noting that "warrants [based on an anonymous tip] do not necessarily pass muster where the corroboration only went to innocent or innocuous details"); *United States v. Gibson*, 928 F.2d 250, 254 (8th Cir. 1991) (finding insufficient probable cause to issue a warrant based on an anonymous tip where "only several innocent details had been corroborated by the police in driving by the address given and by making a few telephone calls"); *United States v. Mendonsa*, 989 F.2d 366, 369 (9th Cir. 1993) (finding that a partially corroborated tip did not provide probable cause for a crime because the "fact that a suspect lives at a particular location or drives a particular car does not provide any indication of criminal activity.").

From their vantage point on the front door, the police officers did not observe any staggered walking, slurred speech, scattered alcohol bottles, vomiting, or other behavior that might have indicated unlawful furnishing of alcohol to minors. It was only after the officers'

unconstitutional walk around the back of the house, which revealed two open bottles of alcohol in the sitting room, that the officers had probable cause to believe that alcohol was being furnished to underaged people. Without that unconstitutionally derived detail, the affidavit would have been devoid of any reference to criminal activity.

Defendants cite *Suarez v. Town of Ogden Dunes, Ind.*, in support of their position that the officers' warrant is presumptively valid. In *Suarez*, the officers encountered a teenager who had parked without a permit outside a beach house, where a group of teenagers had gathered to enjoy a bonfire. 581 F.3d 591, 594 (7th Cir. 2009). While talking to the teenager, the officer smelled alcohol on the teenager's breath. After speaking to the teenager, the officer "pulled to the end of the road," whereupon "several youths jumped on the trunk of his car." *Id.* He drove by the beach house again, and was subjected to verbal abuse by the group of teenagers. *Id.* Shortly thereafter, the original teenager, who the officer had spoken to about parking, attempted to drive home. *Id.* The officer arrested him for underaged drinking. *Id.* When the officer returned to the beach house to break up the party, he noticed at least six cars parked in the driveway and along the street, and some empty drinking containers in the backyard (which apparently abutted a beach). *Id.* At this point, the officer called for a warrant. *Id.* The plaintiffs in that case argued that, in securing the warrant, the officer lied about seeing the kids "retreat" to the house and hide behind furniture, and that he elided the timing of events to make the situation appear more urgent than it actually was. *Id.* at 596. The Seventh Circuit determined that these misrepresentations were not material in light of the other evidence that the officer had. *Id.*

This case is different from *Suarez* in several important ways. First, Toryfter and Schossow did not have a single opportunity to interact with the kids; they did not smell alcohol on their breaths, observe them stumble, or hear them slur their words. The kids did not do anything demonstrating inebriated judgment, such as jumping on a police car or heckling a police officer. And Toryfter and Schossow did not, subsequent to securing the warrant, arrest a drunk kid on his way home *from* the party. In *Suarez*, the police officer's sworn testimony contained probable cause to search the home, notwithstanding a few misrepresentations. In this case, once the visual on the open containers is subtracted, Toryfter's affidavit was lacking in probable cause for any crime.[2]

### 3.3 Failure to Intervene and Supervisor Liability Claims Against Schossow

Plaintiffs allege that Schossow failed to intervene in the fraudulent warrant obtention and execution. An officer can be liable for failure to intervene where he "(1) knew that a constitutional violation was committed; and (2) had a realistic opportunity to prevent it." *Gill v. City of Milwaukee*, 850 F.3d 335, 342 (7th Cir. 2017). Relatedly, "[t]o succeed on a claim for supervisory liability, a plaintiff must show that the supervisor was personally involved in the constitutional violation." *Id.* at 344 (citing *Matthews v. City of E. St. Louis*, 675 F.3d 703, 707 (7th Cir. 2012)). "That means that the supervisor 'must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what [he] might see.'" *Id.* (citing

---

[2]The basis for defendant's qualified immunity argument is that there was no underlying violation and, if there was, the police had independent probable cause for the search warrant. Reasonably, they do not argue that the right to a valid search warrant based on probable cause was unclearly defined, so the Court will also not engage in that analysis.

*Matthews*, 675 F.3d at 708). "If supervisory liability is predicated on failure to act, the plaintiff must show an 'extremely high degree of culpability.'" *Odogba v. Wis. Dep't of Justice*, 22 F. Supp. 3d 895, 909 (E.D. Wis. 2014) (quoting *Lenard v. Argento*, 699 F.2d 874, 885 (7th Cir. 1983)). A supervisor's "[f]ailure to control [his subordinates] is not actionable at all 'absent a showing that the official either encouraged the specific incident of misconduct or in some way directly participated in it.'" *Id.* at 909–910 (quoting *Lenard*, 699 F.2d at 885). Supervisors who are "merely negligent" or even grossly negligent, are not liable under Section 1983. *Jones v. City of Chi.*, 856 F.2d 985, 992 (7th Cir. 1988).

Plaintiffs contend that Schossow is liable under theories of failure to intervene and supervisor liability (the former of which, when applied to supervisors, becomes a subset of the latter, *see Odogba*, 22 F. Supp. 3d at 909) because he knew that Toryfter was fraudulently applying for a search warrant and did not stop her or review the affidavit before she submitted it to the judge, and because he oversaw the unlawful execution of the search warrant. (Docket #1 at 19–20; Docket #25 at 20). As discussed above, Toryfter and Schossow violated Plaintiffs' Fourth Amendment rights when they searched the curtilage of Plaintiffs' home without a warrant. Further, in obtaining and executing an invalid warrant, Toryfter violated Plaintiffs' Fourth Amendment rights to be free from unreasonable searches and seizures in their home. As for Plaintiffs' contentions that Schossow should be liable, in a supervisory capacity, for failing to stop the obtention and execution of the warrant, this claim fails because an officer "cannot intervene in his own constitutional violation." *Flint v. City of Milwaukee*, 91 F. Supp. 3d 1032, 1063 (E.D. Wis. 2015). Schossow supplied the unconstitutionally derived evidence that was included in the warrant, and

then he took the lead in executing the warrant. This claim should have been brought as a direct claim against Schossow. However, Schossow was not named as a defendant in the direct claim regarding the invalid warrant, (Docket #1 at 16–19), and he cannot be held liable for failing to supervise or intervene in his own conduct. Therefore, this claim will be dismissed.

### 3.4    Municipal Liability Under 42 U.S.C. §14141

By the plain language of the statute, there is no private right of action under 34 U.S.C. § 12601 (formerly 42 U.S.C. § 14141, to which Plaintiffs cite). Plaintiffs do not cite any cases that suggest a contrary conclusion. However, instead of moving to dismiss Plaintiffs' improperly pled claim, Defendants charitably construed it as a *Monell* claim. The Court will engage in a similar analysis, but the result is the same: the claim will be dismissed.

A municipal entity can be liable under Section 1983 only when there is a predicate constitutional violation, and that violation is a result of that entity's (1) express policy; (2) widespread custom or practice; or (3) a decision by an agent of the entity who has "final policymaking authority." *Darchak v. City of Chi. Bd. of Educ.*, 580 F.3d 622, 629 (7th Cir. 2009). Plaintiffs allege that there was an express policy of targeting underaged drinkers; Defendants deny that such a formal policy ever existed. The dispute is immaterial: in order to hold a municipality liable for a constitutional violation, there must be a "direct causal link between the municipal action and the deprivation of federal rights." *Bd of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 404 (1997). Causation is difficult to prove in suits charging municipal liability. In the parlance of *Monell* cases, the challenged policy, practice, or custom must be the "moving force" behind the plaintiff's injury. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389 (1989). Simple but-for causation is not enough. *See Wilson v. Cook Cty.*, 742 F.3d 775, 784 (7th Cir.

2014) (citing *Brown*, 520 U.S. at 410). The Supreme Court has made it abundantly clear that the challenged practice "must be closely related to the ultimate injury" that the plaintiff suffered. *Harris*, 489 U.S. at 391. The Seventh Circuit has said that a "moving force" is the "catalyst" for the injury in question, not merely a "contributing factor." *Johnson v. Cook Cty.*, 526 F. App'x 692, 696 (7th Cir. 2013); *Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010) (training or policy changes that "might" have had an effect on plaintiff's treatment did not satisfy causation requirement).

Even if the Court accepts Plaintiffs' assertion that MCP had a campaign against underaged drinking, Plaintiffs fail to advance a single argument as to why such a campaign might be unconstitutional. In order for a municipality to be liable for a constitutional violation, there must be direct evidence that the policy in question *caused* the constitutional violation. *Brown*, 520 U.S. at 404. There is no evidence of that here. Plaintiffs' attempt to show attenuated, but-for causation (for example, MCP had a campaign prioritizing underaged drinking, therefore they investigated this tip) is unavailing. *Wilson*, 742 F.3d at 784. There is no evidence in the record that the campaign was the moving force behind the officers' decision to unlawfully search the home and curtilage without securing a valid warrant. This claim must be dismissed.

**4.    CONCLUSION**

For the reasons explained above, the Court finds that Toryfter and Schossow violated Plaintiffs' Fourth Amendment right to be free from unreasonable searches in the curtilage. Flowing from this, Toryfter also violated Plaintiffs' Fourth Amendment rights when she obtained an invalid warrant on the basis of the unlawful curtilage search. Schossow, who was Toryfter's supervisor, and who helped obtain and execute the warrant,

cannot be held liable on a supervisory theory predicated on a failure to intervene in his own conduct. Finally, Plaintiffs have failed to provide any evidence as to how the City of Mequon's disputed underaged drinking policy was the moving force behind the Fourth Amendment violation. This claim will proceed to trial on the issue of damages for the direct Fourth Amendment claims against Toryfter and Schossow only, however nominal those damages may be.

Accordingly,

**IT IS ORDERED** that Defendants' motion for summary judgment (Docket #16) be and the same is hereby **GRANTED in part and DENIED in part** as stated in the terms of this order;

**IT IS FURTHER ORDERED** that Plaintiffs' motion for summary judgment (Docket #24) be and the same is hereby **GRANTED in part and DENIED in part**, as stated in the terms of this order;

**IT IS FURTHER ORDERED** that Plaintiffs' claims against Defendant Matthew Schossow for supervisor liability and failure to intervene in the obtention and execution of a search warrant be and the same are hereby **DISMISSED**;

**IT IS FURTHER ORDERED** that Plaintiffs' claims for Fifth and Fourteenth Amendment violations be and the same are hereby **DISMISSED**;

**IT IS FURTHER ORDERED** that Plaintiffs' claim for liability against Defendant City of Mequon be and the same is hereby **DISMISSED**;

**IT IS FURTHER ORDERED** that Defendant City of Mequon be and the same is hereby **DISMISSED** from this action; and

**IT IS FURTHER ORDERED** that the John and Jane Doe defendants be and the same are hereby **DISMISSED** from this action.

Dated at Milwaukee, Wisconsin, this 24th day of September, 2019.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge